**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| GERALD HEBERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 2:07-CV-91 PPS |
| | ) |
| DAVID REYNOLDS, MARK HARRIS, | ) |
| STEVE LAWRENCE, GEORGE | ) |
| GONZALEZ, and JOHN DOES, | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

On March 25, 2005, at approximately 1:30 a.m., Gerald Hebert was asleep in bed until four Porter County police officers showed up at his home and started banging at the door. When Hebert appeared, the officers told him that they had a court order to confiscate his firearms and remove him from his home. Hebert, unable to read the order without his glasses, took the officers at their word and let them in. Hebert's son, who was staying with his father that night, took a look at the document and confirmed that it looked official. So Hebert complied with the officers' instructions and quietly left his home and gave up his firearms without incident.

As it turns out, there never was a court order. All the officers had was a notice for Hebert to appear at a protective order hearing and a petition for protective order filed by Hebert's wife. What complicates matters is that the notice to appear was signed by a magistrate judge and – due to a clerical error by the court – incorrectly stated that Hebert's wife had been granted a temporary protective order. Now that the truth is known, Hebert is suing the officers and the Porter County Sheriff for violations of his Fourth and Fourteenth Amendment rights and for state law tort damages. The parties have filed cross-motions for summary judgment. For the

following reasons, Hebert may proceed on his claim that Lieutenant George Gonzalez unlawfully seized his guns in violation of his Fourth Amendment rights.

## I. BACKGROUND

Gerald Hebert is a 74 year-old man who lives in Valparaiso, Indiana. (DE 32-3 at 3, Tr. 5.)[1] On March 21, 2005, Hebert's wife, Diane, filed for divorce. (DE 34-3 at 3, Tr. 5.) Concerned about her husband's response, Diane also filed a Petition for Protective Order in Porter County Superior Court that same day. (DE 34-3 at 13-17.) In that Petition, Diane alleged that Hebert had recently had several violent outbursts, threatened her on a couple of occasions, threatened to commit suicide, and shoved her out of the way. (*Id.* at 14-15.) The standard form petition had two categories of relief that the petitioner could request. (*Id.* at 13-17.) The first category listed certain ex parte relief that "may be granted immediately by the Judge, but the Court must hold a hearing within thirty (30) days." (*Id.* at 16.) In this section, Diane requested Gerald's removal from the home, possession of the marital residence, and possession of their 2000 Jeep Cherokee. (*Id.*) The second category listed certain types of relief that "may be granted ONLY after notice to the Respondent and at a hearing to be held within thirty days." (*Id.* at 16-17) (emphasis in original). In this section, Diane checked off that she wanted Hebert to surrender his firearms. (*Id.* at 17.)

The state court judge denied Diane's petition, but mistakenly signed and issued a notice for Hebert to appear at a protective order hearing that indicated that an ex parte order for protection *had* been granted. (Powell Aff., DE 34-3 at 19-22.) That oversight triggered the

---

[1] The Parties have filed numerous exhibits for the Court's consideration of these motions. To avoid confusion, I have cited to the docket entry ("DE") number and page number as the record appears in the CM/ECF system. Where I have cited to a deposition transcript, I have also included the transcript ("Tr.") page number.

unfortunate chain of events in this case.

On March 24, 2005, the erroneous notice was sent to the Civil Bureau division of the Porter County Sheriff's Department along with a copy of Diane's petition. (DE 34-4 at 2; *see also* DE 34-4 at 32-33, Tr. 19-20.) Upon receiving court documents, the Civil Bureau's normal practice is to review the documents and determine whether to serve them through a process server or execute them through the patrol division. (DE 34-5 at 4, Tr. 8; DE 32-9 at 17-18, Tr. 16-17.) It isn't clear who processed Hebert's papers that night, but Civil Bureau Supervisor Kathryn Nichols testified that if someone in her division received a notice to appear indicating that an ex parte protective order had been entered – but no order was attached – the proper procedure would be to call the court and obtain a copy of the order. (DE 34-5 at 6-8, Tr. 23-25.) However, in this instance, the Civil Bureau submitted the Notice to Appear to the patrol division for execution without verification from the court that an ex parte order actually existed. (*Id.*)

Sometime around 11:00 p.m. that night, Lieutenant George Gonzalez was informed by the police radio operator that a protective order needed to be executed. (DE 34-4 at 7, 12, Tr. 28, 47.) Since the Civil Bureau never received a protective order from the court, Gonzalez was given only the Notice to Appear and Diane's petition. (*Id.* at 10, Tr. 33.) Gonzalez never asked to see the actual protective order, but he believed one existed because the Notice to Appear was signed by the judge and indicated that one had been entered. (*Id.* at 9, Tr. 30.) Gonzalez then radioed Officers John Brubaker, Mark Harris and Phil Miller to meet him at a nearby highway intersection. (*Id.* at 12, Tr. 47.) There, Gonzalez informed the other officers that he had an order to serve and he needed additional help because there was an indication that the subject had guns and a hot temper. (*Id.* at 13, Tr. 49.)

Several of the officers testified that they had received notices to appear in the past where

3

the judge attached the petition and simply crossed out what they didn't want executed, rather than drafting a separate order. (*Id.* at 14-15, Tr. 57-58; *Id.* at 35, Tr. 41; DE 34-5 at 18, Tr. 41.) But at oral argument, Defendants' counsel clarified that when the courts marked up petitions in this manner, those petitions were attached to an *actual order* – unlike this case where there was no order. The officers didn't verify the content of the orders because they say it was the Civil Bureau division's responsibility – not theirs – to verify orders and determine whether they required immediate execution. (DE 34-4 at 11, Tr. 41; *Id.* at 33-34, Tr. 20-21; DE 34-5 at 17-18, Tr. 30-31.) Instead, the officers took the unmarked petition by itself to mean that the Court granted Diane everything she requested in her petition. (DE 34-4 at 9, 14, Tr. 30; *Id.* at 35, Tr. 41.) Harris testified that he never personally saw the documents, but was simply following Lieutenant Gonzalez's instructions. (*Id.* at 23, Tr. 20.) And Sheriff Reynolds vouched for his officers, saying the decision to act upon these particular documents as if they were court orders reflected department policy. (DE 32-9 at 40-41, Tr. 39-40.)

At approximately 1:30 a.m., the officers arrived at Hebert's house and started banging on his door. (DE 32-3 at 4, Tr. 10.) When Hebert appeared, the officers asked him to step outside. (*Id.*, Tr.12.) One of the officers read from some papers that they were there to remove Hebert from his home and confiscate Hebert's weapons. (*Id.* at 5, Tr. 13.) The officer then handed Hebert the papers, but Hebert couldn't read them because he didn't have his reading glasses and his eyes were tearing from fear. (*Id.*) Hebert told the officers he would need to go inside in order to read the document. (*Id.*) The officers followed him. (*Id.*) Once inside, Hebert was in shock by the presence of armed officers in his house and still had trouble reading the document. (*Id.* at 6-7, Tr. 20-23.) So Hebert called for his son, Jacques, who was asleep downstairs, to help him. (*Id.* at 9, Tr. 30-31.) Jacques looked at the papers and confirmed that they appeared

official. (*Id.*, Tr. 31.)

Hebert then directed the officers to his bedroom, where the guns were located. (*Id.*, Tr. 32.) The officers collected the guns, took inventory, and hauled them out of Hebert's home. (*Id.* at 10, Tr. 33-34.) Afterwards, most of the officers took off; one remained behind to make sure Hebert left too. (*Id.*, Tr. 33-35.) Hebert then packed his things and drove off to stay with a friend. (*Id.*, Tr. 35-36.) Hebert had no complaints about the officers' behavior that night. (*Id.* at 11, Tr. 37-38.) They were respectful and professional. (*Id.*)

Over three weeks later, on April 18, 2005, a provisional hearing and protective order hearing were held before a Porter County Judge in the divorce case. (DE 34-6 at 2.) At the hearing, the judge denied the petition for protective order because "there was not a sufficient history of domestic violence or any real substantial threats of violence." (*Id.*) However, the judge granted Diane sole possession of the marital residence and ordered that Hebert's guns be placed in the custody of someone of Hebert's choosing for the duration of the divorce proceedings. (*Id.* at 3.)

On March 23, 2007, Hebert filed this lawsuit against Officers Gonzalez and Harris. (Earlier in this case, I dismissed Defendant Porter County from this lawsuit.) Hebert also named Officer Steve Lawrence and other unnamed officers as defendants, but Hebert's counsel recently informed the Court at a hearing that Hebert is no longer pursuing his claims against those defendants. Hebert has asserted Fourth and Fourteenth Amendment claims under Section 1983, as well state law claims for trespass and conversion. Hebert has also named Sheriff Reynolds as a defendant in his official capacity, claiming the Sheriff's Department is liable for its policies

5

and practices and failure to train its employees.[2]

Defendants have moved for summary judgment on all counts, and Plaintiff has moved for partial summary judgment on his Fourth Amendment claims.

## II. DISCUSSION

Summary judgment is proper where the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 618, 625 (7th Cir. 2001). When examining the record, the court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Id.* When parties bring cross-motions for summary judgment, the court should "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526 (7th Cir. 2005).

**A.     Claims Against Officers Gonzalez and Harris**

42 U.S.C. § 1983 creates a cause of action when constitutional rights are violated by those acting under color of law. Hebert claims Officers Gonzalez and Harris violated his Fourth and Fourteenth Amendment rights in three ways: by seizing his person, by seizing his guns, and

---

[2] Hebert also states in his complaint that his Fifth Amendment rights were violated. But the Fifth Amendment's Due Process Clause only governs federal actors, and Hebert's allegations only involve local officials. *Dusenberry v. United States*, 534 U.S. 161, 167 (2002). Hebert makes no reference to any Fifth Amendment claims in his summary judgment briefing, so it does not appear that he is actually pursuing a Fifth Amendment claim. To the extent he is, that claim has no basis to proceed and is dismissed.

by depriving him of his guns without due process. Gonzalez and Harris seek summary judgment on these claims based on qualified immunity.

Police officers performing discretionary functions are entitled to qualified immunity and are shielded from civil liability for their actions unless the facts, taken in the light most favorable to the plaintiff show: (1) that the officer's conduct violated a constitutional right; and (2) that the right was clearly established at the time of the alleged violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The unlawfulness of the act must be apparent in light of pre-existing law. *Id.* Put differently, an officer is entitled to qualified immunity if it was objectively reasonable under the specific set of circumstances for the officer to believe that his actions were lawful. *See Phelan v. Vill. of Lyons*, 531 F.3d 484, 488 (7th Cir. 2008). The doctrine of qualified immunity leaves "ample room for mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008). Thus the plaintiff bears the "rather heavy burden" of demonstrating that qualified immunity should not apply. *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994).

The Supreme Court has recently stated that district courts may address the two prongs of the qualified immunity analysis in any order at their discretion. *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). In this case, it makes sense to perform the qualified immunity analysis separately for each of the three federal claims against the officers.

1. Seizure of Person

Hebert claims that Gonzalez and Harris unconstitutionally seized him when they removed

him from his home.  Typically, Fourth Amendment seizure of person cases involve situations where an officer terminates the subject's freedom of movement through means intentionally applied.  *See Leaf v. Shelnutt*, 400 F.3d 1070, 1089 (7th Cir. 2005).  This case presents an inversion of the traditional theory of liability because Hebert's freedom of movement wasn't terminated.  He was free to go anywhere he pleased other than one location – his home.

The Seventh Circuit has had several opportunities to decide whether a situation like this rises to the level of a Fourth Amendment seizure; but the issue remains unresolved.  In *Kernats v. O'Sullivan*, 35 F.3d 1171 (7th Cir. 1994), tenants of a leased home sued a police officer who – acting on a court order – ordered the tenants to leave by the end of the day or face arrest.  *Id.* at 1173-74.  The Court was divided three ways and could not agree on whether the tenants were seized under these circumstances.  *Id.* at 1178-85.  In *Spiegel v. City of Chicago*, 106 F.3d 209 (7th Cir. 1997), a tenant was ordered by police not to enter his apartment under threat of immediate arrest.  *Id.* at 210.  The Court did not decide whether or not a seizure had occurred, but found that qualified immunity applied because the tenant's right not to have police block him from entering his apartment was not clearly established under the law.  *Id.* at 212.  In *White v. City of Markham*, 310 F.3d 989 (7th Cir. 2002), a case with similar facts, the Court commented that "under [a] factual scenario, when the plaintiffs were free to leave and thereby terminate the encounter at any time it is unclear whether a seizure occurred." *Id.* at 995.  The Court ultimately declined to resolve the question of seizure and instead examined the reasonableness of the officers' conduct in that case and found that, even if a seizure had occurred, it was reasonable.  *White*, 310 F.3d at 995.  In *Lumini v. Grayeb*, 184 Fed. Appx. 559 (7th Cir. 2006), the district court found that there was a genuine issue of fact as to whether the plaintiff was seized when police ordered him to leave his house.  *Id.* at 562.  The Seventh Circuit ignored the question of

8

seizure on appeal and instead determined that "even if [plaintiff] was seized, the seizure was not unreasonable." *Id.*

I find it hard to believe that forcibly removing someone from his home is not a Fourth Amendment seizure. The Fourth Amendment by its terms protects "[t]he right of the people to be secure in their persons [and] houses." U.S. Const. amend. IV. The Supreme Court has emphasized that "at the very core of the Fourth Amendment stands the right of a man to retreat into his own home." *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992) (citations omitted). One would think that the factual circumstances presented in this case – where law enforcement interfered with a person's peace and security within his home – fit squarely within the scope of what the Fourth Amendment was intended to prevent.

Like the plaintiffs in *Kernats*, *Spiegel*, *White*, and *Lumini,* Hebert labeled the removal from his home as a seizure of his person. However, the Seventh Circuit has repeatedly expressed reluctance about whether these facts fit under the seizure of person theory. So it cannot be said that the right was clearly established in light of pre-existing law. Defendants are therefore entitled to qualified immunity on this claim. Perhaps Hebert would have faired better if he characterized this as a seizure of his property. *Soldal*, 506 U.S. at 61 ("A seizure of property, we have explained, occurs when there is some meaningful interference with an individual's possessory interests in that property."). But he never does. Rather, in his briefs, Hebert compartmentalizes the two claims, identifying the removal from his home as his seizure of person claim, and repeatedly stating that his seizure of property claim refers to the seizure of his *firearms*. (DE 32; DE 43.) Indeed, when I asked defense counsel at oral argument why this wasn't a seizure of property, defense counsel responded that it could be but Hebert isn't arguing that it is. For that reason, the parties never argued this point in their briefs. Therefore, Hebert

9

has waived any argument that the removal from his home is a seizure of his property.

    2.    <u>Seizure of Property</u>

The constitutionality of the officers' warrantless seizure of Hebert's firearms is more straightforward. Seizing personal property without a judicial warrant that particularly describes the items to be seized is presumptively unreasonable. *United States v. James*, 571 F.3d 707, 713 (7th Cir. 2007). There are few exceptions; one is where someone with actual or apparent authority over the premises freely and voluntarily consents to the seizure. *See U.S. v. Figueroa-Espana*, 511 F.3d 696, 704 (7th Cir. 2007). Whether consent is voluntary is a question of fact. *Id.* The factors bearing on this inquiry include: (1) the person's age, intelligence and education; (2) whether he was advised of his constitutional rights; (3) how long he was detained before he gave his consent; (4) whether his consent was immediate or prompted by several repeated requests; (5) whether there was physical coercion; and (6) whether he was in police custody at the time of consent. *Id.* at 705.

An officer's improper claim of authority weighs against a finding of voluntary consent. *See United States v. McGraw*, 571 F.3d 624, 629-30 (7th Cir. 2009). This point is demonstrated in *United States v. Nafzger,* 965 F.2d 213 (7th Cir. 1992). There, officers investigating a car-theft ring obtained a search warrant to search for a specific stolen car. *Id.* at 215. However, the warrant didn't describe with particularity the places to be searched and was thus defective. *Id.* at 216. The officers nevertheless showed up at the defendant's farm, showed him the warrant, and told him they were there to search a car matching the description of the car in the warrant. *Id.* at 215. Believing the officers were acting under proper authority, the defendant led them to the truck and signed a consent-to-search form. *Id.* The Court held that, even though the defendant gave his written consent, he was under the mistaken impression that the officers had a valid

search warrant and was merely "acquiesc[ing] to a claim of lawful authority"; therefore, the consent wasn't voluntary. *Id.* at 216-17.

The officers claim that Hebert consented to the officers taking his guns. That strikes me as preposterous. Four armed officers showed up at Hebert's house in the middle of the night and told Hebert they had authority to take his guns. Similar to *Nafzger*, the officers showed Hebert a piece of paper which they claimed to be the source of that authority. Hebert showed the paper to his son, who said it looked official. If Hebert had read the document carefully, he might have realized that the paper wasn't really what the officers claimed it to be. But Hebert was an elderly man, it was late, and he was frightened. So he did what many rational people would've done under the circumstances: he took the uniformed men with badges and guns at their word and let them take his guns. Nothing about this was voluntary. The fact that Hebert was cooperative and assisted the officers in gathering the firearms is neither here nor there. Like the defendant in *Nafzger*, Hebert was simply acquiescing to a false claim of lawful authority.

The constitutional standard of reasonableness under the Fourth Amendment is different from the objective standard of reasonableness in qualified immunity determinations. *See Malley v. Briggs*, 475 U.S. 335, 344-45 (1986). So even though the officers' seizure of Hebert's firearms was constitutionally unreasonable, I must still determine whether it was reasonable for the officers to believe they were acting lawfully under the circumstances. *See id.* On the night in question, Officers Gonzalez and Harris were under the mistaken belief that the Porter County Superior Court had issued a protective order against Hebert. They had every reason to believe that a protective order existed because they had a court document signed by a judge saying just that. And because the radio dispatcher informed them that the documents needed to be served by the night patrol division, they were under the impression that they were responsible for executing

11

the terms of the protective order. The problem is the officers didn't have a copy of the protective order, so they didn't know its terms, which begs the question: what would a reasonable officer do under the circumstances?

The Ninth Circuit addressed this question in *Beier v. City of Lewiston*, 354 F.3d 1058 (9th Cir. 2003). Beier's wife obtained a protective order against him pending the resolution of their divorce proceedings. *Id.* at 1061. The protective order prohibited Beier from being within 300 feet of his wife's residence or workplace, but didn't place limitations on being in her presence anywhere else. *Id.* Soon after, the couple ran into each other at church. *Id.* at 1062. Beier's wife didn't like him being there; so she called the police and told them that Beier was violating a protective order. *Id.* The police officers handling the matter confirmed with the dispatcher that a protective order had been issued and served, but never requested the order's terms. *Id.* When the officers arrived, plaintiff refused to leave; so the officer arrested him. *Id.* Plaintiff subsequently sued the city and the officers for false arrest. *Id.* at 1063. The Court held that law enforcement officers who act to enforce protective orders "have a responsibility to familiarize themselves with the order's precise contents through some official source." *Id.* at 1069. This is because officers cannot reasonably enforce the law "if they make no attempt to ascertain the applicable prohibitions." *Id.* at 1070. Since the police officers never bothered to learn the terms of the protective order, the Court determined they were not entitled to qualified immunity. *Id.* at 1072.

Similarly in this case, Officer's Gonzalez and Harris acted without ever knowing the terms of the protective order. Their sole explanation is that they *assumed* the Court had granted Diane everything she requested. They were under this impression because, in their experience, state judges attached marked up petitions to their orders all the time. There are two problems

with this argument. First, unlike those past instances, there was no order in this case. Without an order, the freestanding unmarked petition was nothing more than a *request* for relief. Second, even if the court had granted Diane everything she requested, the petition itself plainly states that the respondent's guns can only be taken away after notice has been given and a hearing held. (DE 34-3 at 13-17.) The officers were there to serve Hebert a notice to appear for the very hearing at which the court could order that the guns be surrendered. So there's no plausible way the officers could have concluded from the documents they were given that the court had ordered the confiscation of the guns.

The officers place too much emphasis on the fact that they were operating under a mistake of facts. The only mistaken information they were given is that a protective order existed. After that point, it was incumbent upon the officers to find out what the precise terms of the protective order were so that they would know what in fact they were enforcing. *See Beier*, 354 F.2d at 1069. This is important because protective orders are not one-size-fits-all documents. The Indiana Civil Protection Order Act prescribes six categories of relief that can be granted ex parte, and another 12 forms of relief that may be granted at a subsequent hearing. Ind. Code § 34-26-5-9. When Officer Gonzalez received the notice to appear and petition from the Civil Bureau division – but no order – he should have ascertained what relief the judge actually granted. But he didn't. Instead, he guessed (wrongly) that the judge granted all the relief that Diane requested, plus relief that was premature.

The officers have further stressed that there is an incredible amount of pressure in domestic violence cases for officers to act quickly. The consequences for failing to act in such situations can be dire. According to the officers, they were acting prudently. But the prudent course of action would have been to call the Civil Bureau or the radio dispatcher to find out what

13

the order said.  If Gonzalez did that, maybe a red flag would have been raised that was in fact no order.  And while domestic violence cases often present volatile situations, the facts in this case did not.  When the officers appeared at the door, Hebert did not resist the officers' commands or show any hostility.  He acted cooperatively.  Hebert's advanced age made him less of a threat.  And the fact that Hebert was being removed from the home reduced fears that he would harm his wife.  So there were simply no exigent circumstances that justified the need to seize Hebert's firearms to maintain peace or security.

Officer Harris, however, is held to a different standard than Officer Gonzalez.  Harris was simply following Gonzalez's orders.  He never saw the papers themselves and was simply called to the scene for extra manpower.  Since Gonzalez was the one who called him to the scene, and Gonzalez was a lieutenant, it was reasonable for Harris to rely on Gonzalez's representations that they had lawful orders to confiscate Hebert's weapons.  *See United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) ("[P]olice who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency.").  Therefore, Harris is entitled to qualified immunity.  *See Bibart v. Stachowiak*, 888 F. Supp. 864, 867 (N.D. Ill. 1995).

But Gonzalez did received the documents and, even though the documents didn't contain a court order, he confiscated Hebert's weapons anyway.  This means Gonzalez either guessed as to the terms of the order or didn't read the documents with any degree of care.  Either way, a reasonable officer faced with Gonzalez's circumstances would have clearly known that he didn't have legal authority to take Hebert's guns.  Therefore, qualified immunity doesn't apply to Gonzalez on Hebert's Fourth Amendment seizure of property claim.

3.  Procedural Due Process

The Fourteenth Amendment's Due Process Clause requires that the state provide a citizen with notice and a opportunity to be heard before being deprived of his property. *Taake v. County of Monroe*, 530 F.3d 538, 543 (7th Cir. 2008); *see also* U.S. Const. amend. XIV. However, in some circumstances, there is simply no way for the state to provide pre-deprivation procedures. For example, where the loss occurs because of a random and unauthorized act by a state employee, it is simply impractical to impose liability for failure to provide due process. *Belcher v. Norton*, 497 F.3d 742, 750 (7th Cir. 2007). In those cases, the victim's procedural due process rights are not violated if the state affords him a meaningful post-deprivation remedy. *Id.* The fact that the plaintiff might be able to recover more in a Section 1983 action does not render the state remedy inadequate. *See Gable v. City of Chicago*, 296 F.3d 531, 540 (7th Cir. 2002).

There is no doubt in this case that Hebert was removed from his home and deprived of his firearms as a result of the officers' unauthorized actions.[3] The officers just didn't know that their actions were unauthorized. Therefore, it would have been impossible for the state under those circumstances to have afforded Hebert a pre-deprivation hearing. Defendants contend that Hebert was nonetheless provided an adequate opportunity to contest the deprivation of his guns at the subsequent protective order hearing. At that hearing, the state court judge essentially affirmed the officers' actions and ordered that the guns remain out of Hebert's possession for the duration of the divorce proceedings. Hebert counters that the post-deprivation protective order

---

[3] Hebert alleges in Count VI of his Complaint that he was "denied the right to be free from the deprivation of his liberty" when the officers removed him from his home without due process. (Compl. ¶¶ 54-58.) "Liberty" is a broad term that may refer to any number of interests or expectations of interests arising from the federal Constitution or state laws. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). It is not readily apparent to me what liberty interest Hebert is asserting in this count. But the Defendants do not contend that Hebert failed to assert a liberty interest, so I will assume for now that he has.

hearing was inadequate because at that point, when the guns were already taken from him, he was at a serious disadvantage. That argument is unpersuasive. Whether or not Hebert believes he was at a disadvantage, he was given an opportunity – mere weeks after his guns were taken – to persuade the judge to order that his property be returned. Since Hebert was afforded a meaningful post-deprivation remedy to cure his loss of property, his procedural due process claim against the individual officers is dismissed.

      4.      State Law Claims

Hebert's state law claims for trespass and conversion are non-starters. Indiana law shields a government employee from tort liability if the loss results from his law enforcement duties. Ind. Code § 34-13-3-3(8); *see also Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. App. Ct. 2002) (finding immunity applied to officers who were acting under an erroneous belief that a protective order existed). The evidence clearly establishes that Gonzalez and Harris were acting within the scope of their duties during the night of the incident. Hebert doesn't attempt to refute this point; indeed he concedes that the officers acted in a professional manner that night. Therefore, the state law claims are dismissed.

**B.    Municipal Liability**

Hebert has also asserted official capacity claims against Gonzalez, Harris and Sheriff Reynolds. Claims against government officials in their official capacities are actually claims against the government entity they work for. *See Kentucky v. Graham*, 473 U.S. 159, 167 (1985). In other words, these claims are really one and the same.

Defendants argue that Hebert cannot establish the Sheriff's Department's liability for any deprivations of his constitutional rights. In order for a municipal agency to be liable under Section 1983, the agency itself must cause the violation. *See Monell v. Dep't of Soc. Servs. of*

*City of N.Y.*, 436 U.S. 638, 692-93 (1978). A plaintiff can establish this by proving: (a) the existence of an agency policy that caused the deprivations; (b) that the person who committed the violation was an official with final policy-making authority; or (c) the existence of a practice or custom so widespread or persistent that it rises to the level of a policy that can be fairly attributed to the agency. *See Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008).

Hebert attempts the first and third methods. Therefore, he must demonstrate the existence of an official agency policy or custom, and show that the policy or custom was the moving force behind the violation. *See Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514-15 (7th Cir. 2007). To make his case, Hebert points me to the following portion of Sheriff Reynolds's deposition transcript:

> Q: But you would have acted upon [the notice to appear and petition for protective order] as if it were an order, would you not?
>
> A: If it came from the court, yes, mistakenly, but I would have acted as it was an order because that's how it was presented. . . .
>
> Q: Okay, my question to you is, is it reasonable for you to act upon [these documents] without there being an actual order?
>
> A: Yes.
>
> Q: And this reflects department policy, does it not?
>
> A: Does – what was the question?
>
> Q: You acting upon [these documents] as if they were orders?
>
> A: Yes.

(DE 32-9 at 40-41, Tr. 39-40.) Hebert argues that this testimony demonstrates a department policy to execute notices to appear and/or petitions for protective orders as actual court orders. That dramatically overstates Reynolds's testimony. At best, this testimony indicates that he

17

would have been under the same mistaken impression as the officers under these circumstances. In fact, earlier in his deposition, Reynolds expressly denied the existence of any department policy to treat notices to appear or petitions as actual orders or to seize citizens or firearms without a court order. (DE 32-9 at 20-21, Tr. 19-20.)

Hebert alternatively argues that, regardless of any official policy, it was a widespread practice for officers to treat petitions for protective orders as actual orders. In truth, several of the officers testified that they had previously received orders where the judge simply attached a marked up copy of the petition to show what he was granting and denying. (DE 34-4 at 14-15, Tr. 57-58; *Id.* at 35, Tr. 41; DE 34-5 at 18, Tr. 41.) There is nothing in the record to suggest that Porter County officers routinely treated the petitions themselves as orders. And other than this case, Hebert has not demonstrated one other instance – let alone a pattern – where the Porter County officers executed documents that were not actually orders. Without more, there's simply not enough evidence of an unconstitutional custom or practice at the Porter County Sheriff's Office.

Finally, Defendants claim that the Sheriff's Office is not liable under a failure to train theory. To establish liability for inadequate training, a plaintiff must prove deliberate indifference on the part of the municipal agency. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006). Deliberate indifference can take two forms: (1) the failure to provide adequate training in light of foreseeable consequences; or (2) the failure to act in response to repeated complaints of constitutional violations by officers. *Id.* Hebert hasn't made an attempt in his briefs to argue for liability under this theory. I have no idea what training the officers did or did not receive and whether the Sheriff's Department's failure to provide certain training led to the violations in this case. Nor is there any evidence of complaints by other

18

citizens of Porter County officers improperly executing court documents.

On such thin evidence, no reasonable juror could find that the Sheriff's Department caused the violations based on an official department policy or widespread custom or failure to provide certain training. Therefore, the municipal liability claims must also be dismissed.

### III. CONCLUSION

For the foregoing reasons, the parties' cross-motions for summary judgment [DE 31; DE 33] are **GRANTED IN PART AND DENIED IN PART**. Plaintiff is **GRANTED** summary judgment on his claim that Defendant George Gonzalez unconstitutionally seized his firearms. All other claims and parties are **DISMISSED**. The Court further **SCHEDULES** this matter for a telephonic status hearing on **Thursday, November 5, 2009, at 11:00 a.m. Hammond/Central Time** before the undersigned for the purpose of setting the Final Pretrial/Settlement Conference and Trial dates. The parties are **ORDERED** to notify the Case Management Deputy by email at simon_chambers@innd.uscourts.gov **48 hours in advance** of the hearing as to which attorneys will be participating on the conference call and what telephone number should be used to contact them.

**SO ORDERED**.

ENTERED: September 15, 2009

                                                      s/ Philip P. Simon
                                                      PHILIP P. SIMON, JUDGE
                                                      UNITED STATES DISTRICT COURT